**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

NIKKI JANE NIEMAN,

    Plaintiff,

vs.

FIRSTAR BANK, a/k/a U.S. Bancorp,
a/k/a U.S. Bank (Firstar),

    Defendant.

No. C03-4113-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *A. Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . 6
   *B. Federal "Safe Harbor" Immunity* . . . . . . . . . . . . . . . . . . . . . . 7

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On October 1, 2003, plaintiff Nikki Jane Nieman filed this lawsuit in the Iowa District Court In And For Woodbury County against Firstar Bank. Firstar removed this case to this court on November 23, 2003, pursuant to 28 U.S.C. § 1441. In her petition, plaintiff Nieman asserts claims for malicious prosecution, abuse of process, defamation and punitive damages against Firstar. Plaintiff Nieman's claims stem from Firstar's alleged involvement in the federal government's investigation into alleged banking irregularities at a branch of the bank where Nieman worked, her subsequent firing, and her criminal prosecution by federal authorities.

Defendant Firstar has moved for summary judgment on all claims. Defendant Firstar asserts that it has unqualified immunity for the activities alleged as the basis for each of plaintiff Nieman's claims. Defendant Firstar alternatively argues that plaintiff Nieman's malicious prosecution claim fails as a matter of law because defendant Firstar did not initiate the criminal proceedings against plaintiff Nieman. Defendant Firstar further argues that plaintiff Nieman's abuse of process claim fails as a matter of law because defendant Firstar did not use any legal process to accomplish a purpose for which it was not designed. Finally, defendant Firstar asserts that summary judgment must be granted with respect to plaintiff Nieman's defamation claim because defendant Firstar did not publish any defamatory statement about Nieman, and defendant Firstar is not liable for any self-publication of defamatory statements by Nieman. Plaintiff Nieman filed a timely resistance to defendant Firstar's motion in which she urges, *inter alia*, for the court to adopt a "good faith" requirement for the immunity accorded by federal law to apply. Defendant Firstar filed a timely reply brief.

Before turning to a legal analysis of the motion for summary judgment, the court

must first identify the undisputed factual background of this case as well as the standards for disposition of a motion for summary judgment.

### B. *Factual Background*

The record reveals that the following facts are undisputed for the purposes of defendant Firstar's Motion For Summary Judgment.

Plaintiff Nikki Jane Nieman worked at the Morningside branch of Firstar Bank in Sioux City, Iowa, from January 2000 to October 2001. Kris Jones was Nieman's supervisor when she began working for Firstar. In 2001, Nieman was the manager of the Morningside branch. Jeff Wahl was the fraud investigator for defendant Firstar during the time that Nieman was employed at Firstar. In the summer of 2001, Wahl began to investigate an alleged teller shortage of $37,000 at Firstar's Morningside branch. Wahl discovered that Nieman may have been conducting transactions on her own account and the account of Atlantis Construction, which was her husband's company. Wahl questioned Nieman as part of his investigation into the teller shortage. At some point, Wahl provided documents to Secret Service Special Agent Robert Koob.

On March 6, 2001, the Atlantic Construction account was overdrawn in the amount of $5,505.62. At that point, the account was automatically closed or "charged off" and the amount of the overdraft that had been paid by the bank was sent to an outside collection agency. On March 7, 2001, someone using Nieman's identification number accessed the Atlantis Construction account and changed it from a closed account to an open account. This change permitted more checks to be approved for an overdraft. Nieman knew that the account had been reopened on March 7, 2001. Nieman does not recall reopening the Atlantis Construction account. Nieman subsequently paid a collection agency for the overdrafts on the Atlantis Construction account.

The Atlantis Construction account was charged off again in April 2001. The only bank employees besides Nieman who could have reopened the Atlantis Construction account were Sheila Allen-Rager and Chris Vogt. Nieman concedes that no one else would have had a financial motive or other incentive to reopen the Atlantis Construction account. Someone using Nieman's identification number also approved overdrafts for the Atlantis Construction account. Nieman can remember giving her identification number to only one individual, Sheila Allen-Rager. Allen-Rager testified that she has never accessed the Atlantis Construction account with Nieman's identification number. Chris Vogt testified that he was never given Nieman's identification number and that he never used Nieman's password to access any accounts of the bank.

Nieman admits that on one occasion she accessed her own account and reversed a decision to return an overdraft check, so that the check would be paid by the bank and she would be charged an overdraft fee. Nieman also admits that she processed or approved transactions relating to her own personal accounts, the accounts of family members or personal acquaintances, or accounts to which she had a personal interest.

Firstar's Human Resources Policies and Procedural Manual in effect at the time stated: "Employees are not permitted to process or approve any type of transaction on their own or family member's accounts." Nieman admits that the prohibition of conducting transactions on an employee's own account is broader than just prohibiting teller transactions on the account.

Nieman was indicted by a federal grand jury on criminal charges on March 19, 2003. A superseding indictment was also returned by a federal grand jury on May 22, 2003. On May 30, 2003, in response to Nieman's Motion to Dismiss, the court dismissed Counts 2 and 3 of the superseding indictment. Count 1 of the superseding indictment was not dismissed and was tried to a federal jury. Nieman was acquitted on the charge

4

contained in Count 1 of the superseding indictment. Nieman testified at trial that Wahl told her that if she did not admit to taking the money that criminal charges were going to be filed against her. Allen-Rager testified at Nieman's trial that she also owed Firstar for overdrafts and insufficient fund fees and that she told this to Wahl and Koob in a meeting. Allen-Rager also testified at Nieman's trial that, based on her meeting with Wahl and Koob, it was her understanding that the charges brought against Nieman were designed to get someone to talk about the missing $37,000.

Nieman believes that Firstar's involvement in the criminal charges filed against her consisted of contacting the United States Attorney's Office or the Secret Service in August or September of 2001, when she was still employed at the bank. Nieman believes that Firstar provided information, including witnesses and documents, to the prosecution. Nieman cannot distinguish between Firstar's involvement in the initiation of criminal proceedings and that of the United States Attorney's Office or the Secret Service.

Nieman is not aware of anyone outside Firstar who has received information from Firstar about the criminal charges, other than the United States Attorney's Office and the Secret Service. All of Nieman's claims regarding wrongdoing by Firstar fall within the scope of Firstar's activity with the criminal investigation, criminal trial, and the termination of Nieman's employment at Firstar.

Nieman has not tried to obtain employment with any other bank since her termination from Firstar. Nieman believes that when she attempts to obtain future employment, the potential employers will ask why she left Firstar. Nieman became employed by Landmark Management in August 2002. She was also offered employment with Satellite Central in October 2003.

5

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F. Supp. 1224, 1230-31 (N.D. Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F. Supp. 1303, 1305-07 (N.D. Iowa 1997); *Laird v. Stilwill*, 969 F. Supp. 1167, 1172-74 (N.D. Iowa 1997); *Rural Water Sys. #1 v. City of Sioux Ctr.*, 967 F. Supp. 1483, 1499-1501 (N.D. Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir. 2000), *cert. denied*, 121 S. Ct. 61 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 817-18 (N.D. Iowa 1997), *aff'd*, 205 F.3d 1347 (8th Cir. 2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F. Supp. 1237, 1239-40 (N.D. Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F. Supp. 805 (N.D. Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

> Rule 56. Summary Judgment
>
> (a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.
>
> (b) For Defending Party. A party against whom a claim . . . is asserted . . . may, at any time, move for summary judgment in the party's favor as to all or any part thereof.
>
> (c) Motions and Proceedings Thereon. . . . *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no*

*genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law*.

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Quick*, 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of defendant Firstar's Motion For Summary Judgment.

### *B. Federal "Safe Harbor" Immunity*

Firstar asserts that it has immunity under federal law for damages allegedly caused

by its involvement in the investigation and criminal prosecution of plaintiff Nieman. Nieman recognizes that Firstar has some immunity for statements made in a suspicious activity report ("SAR") but argues that this is only applicable to SARs made in good faith. Thus, the court must determine whether the "safe harbor" provision of the Annunzio Wylie Anti-Money Laundering Act requires that a SAR be made in good faith.

In 1992, Congress enacted the Annunzio Wylie Anti-Money Laundering Act ("the Act"). *See* Pub. L. No. 102-550. The Act, in pertinent part, gave the Secretary of the Treasury authority to "require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation."[1] 31 U.S.C. § 5318(g)(1). In order to

---

[1] The Act expressly prohibits a financial institution from disclosing the existence of SARs or other reports of a suspicious transaction made to a government agency. As amended, 31 U.S.C. § 5318(g) states as follows:

> (g) Reporting of suspicious transactions.-
> > (1) In general.-The Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation.
> > (2) Notification prohibited.-
> > > (A) In general.-If a financial institution or any director, officer, employee, or agent of any financial institution, voluntarily or pursuant to this section or any other authority, reports a suspicious transaction to a government agency-
> > > > (i) the financial institution, director, officer, employee, or agent may not notify any person involved in the transaction that the transaction has been

(continued…)

facilitate and encourage financial institutions to report possible criminal activity, the Act gave financial institutions and their officers, employees, and agents immunity from suit based on their having made a SAR.  31 U.S.C. § 5318(g)(3).  The Act's incorporated "safe harbor" provision states:

> Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.

31 U.S.C. § 5318(g)(3)(A).

---

[1](…continued)
> reported; and
>     (ii) no officer or employee of the Federal Government or of any State, local, tribal, or territorial government within the United States, who has any knowledge that such report was made may disclose to any person involved in the transaction that the transaction has been reported, other than as necessary to fulfill the official duties of such officer or employee.

31 U.S.C. §§ 5318(g)(1), (2).

The Secretary of the Treasury subsequently promulgated regulations under the Act that specifically require SARs to be filed whenever a financial institution detects "any known or suspected Federal criminal violation, or pattern of criminal violations, committed or attempted against the bank or involving a transaction or transactions conducted through the bank . . . where the bank believes that it was either an actual or potential victim of a criminal violation, or series of criminal violations, or that the bank was used to facilitate a criminal transaction," and a bank insider was involved; over $5,000 was involved, and the financial institution can identify a suspect; over $25,000 was involved, but the financial institution cannot identify a suspect; or, over $5,000 was involved, as well as potential money laundering or violations of the Bank Secrecy Act are suspected of having occurred. 12 C.F.R. § 21.11(c).[2]

The Eleventh Circuit Court of Appeals addressed the issue of a financial institution's immunity from a defamation claim arising from the filing of a SAR in *Lopez v. First Union Nat'l Bank*, 129 F.3d 1186, 1191 (11th Cir. 1997). In *Lopez*, the court of appeals held that: "[i]n order to be immune from liability, it is sufficient that a financial institution have a good faith suspicion that a law or regulation may have been violated, even if it turns out in hindsight that none was." *Id.* at 1192. Thus, the Eleventh Circuit Court of Appeals included a requirement of "good faith suspicion" before the disclosure of possible violations of law or regulation would qualify for immunity under the Act. In *Lopez*, the

---

[2]Although Firstar is precluded from disclosing whether it made a SAR regarding Nieman, this does not prevent its assertion of "safe harbor" immunity under 31 U.S.C. § 5318(g)(3). Firstar "can assert the immunity without disclosing whether a report was in fact made: all that is required is to assert the immunity in response to any claim by the plaintiff for damages allegedly caused by report or disclosure which is immunized under the Act." *Gregory v. Bank One Corp., Inc.*, 200 F. Supp.2d 1000, 1003-04 (S.D. Ind. 2002).

court concluded that the allegations in that case failed to show that the bank there "had a good faith suspicion that a law had been violated." *Id*. Thus, the court of appeals reversed the dismissal of the complaint.

The Second Circuit Court of Appeals reached the opposite conclusion in *Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999). The Second Circuit Court of Appeals addressed the issue of a financial institution's immunity from a defamation claim arising from the filing of an SAR and noted that "[t]he regulations promulgated under the Annunzio Wylie Act . . . require financial institutions . . . to file an SAR 'no later than thirty (30) days after the initial detection of a known or suspected violation of federal law, a suspected transaction related to money laundering activity, or a violation of the Bank Secrecy Act.'" *Id*. at 543 (citation omitted). The court of appeals further noted that "[t]he safe harbor provision applies, regardless of whether the SAR is filed as required by the Act or in an excess of caution." *Id*. at 544 (citation omitted). Thus, the Second Circuit Court of Appeals held that "[t]he plain language of the safe harbor provision describes an unqualified privilege," and went on to note that the Act's safe harbor provision "does not limit protection to disclosures based on a good faith belief that a violation has occurred." *Id*. at 544-45. The Second Circuit Court of Appeals expressly declined to "import a good faith requirement into the statute." *Id*. at 544. The court based this decision on several factors. First, the court of appeals concluded that the language employed by the Act was clear and unambiguous. As a result, the court found that the "plain meaning of the statute controls its interpretation . . . ." *Id*. at 543 (citing *Greenery Rehabilitation Grp., Inc. v. Hammon*, 150 F.3d 226, 231 (2nd Cir. 1998)). A second consideration in the Second Circuit Court of Appeals's decision in *Lee* came from its review of the legislative history of the Act. *See Lee*, 166 F.3d at 543-44. The court noted that an "earlier draft of the safe harbor provision included an explicit good faith requirement for statements made in an

11

SAR." *Id.* (citing 137 Cong. Rec. S16, 642 (1991)). Because "the requirement was dropped in later versions of the bill, and was not included in the final draft enacted by Congress," *Id.* at 544 (citing 137 Cong. Rec. S17,910, S17,969 (1991)), the court concluded that Congress had considered including a good faith requirement but had specifically rejected incorporating that requirement. Therefore, the court of appeals held that the Act provided "immunity from any law for any statement made in a SAR by anyone connected to a financial institution" without any good faith requirement. *Id.* at 543.

The court is persuaded by the reasoning found in the *Lee* decision; specifically, the plain language of the Act and its legislative history in which the drafters of the Act contemplated but ultimately rejected the inclusion of a good faith requirement. The court is further struck by the fact that since *Lopez* was decided, it has been the subject of significant criticism from other federal courts. See *Whitney Nat'l Bank v. Karam*, 306 F. Supp.2d 678, 680 (S.D. Tex. 2004); *Gregory v. Bank One Corp.*, 200 F. Supp.2d 1000, 1003 (S.D. Ind. 2002); *Stoutt v. Banco Popular de Puerto Rico*, 158 F. Supp.2d 167, 175 (D.P.R. 2001). Courts have also observed that the disclosure of a SAR could compromise an ongoing law enforcement investigation or reveal the methods by which financial institutions attempt to detect suspicious activity. *See Karam*, 306 F. Supp.2d at 680; *Cotton v. PrivateBank and Trust Co.*, 235 F. Supp.2d 809, 815 (N.D. Ill. 2002). Federal courts have also noted that a financial institution's willingness to prepare a SAR might be chilled if it believed that its cooperation may cause customers to retaliate. *See Karam*, 306 F. Supp.2d at 680; *Cotton*, 235 F. Supp.2d at 815.

Thus, the court finds that, based on the clear language of 31 U.S.C. § 5318(g)(3), the intent of Congress that financial institutions should be free to report suspicious transactions without fear of civil liability, and that Congress considered including a good faith requirement but specifically rejected it, defendant Firstar has unqualified immunity

from civil liability for plaintiff Nieman's claims in this case. Therefore, defendant Firstar's Motion For Summary Judgment is granted.

### III. CONCLUSION

The court concludes that based on the clear language of 31 U.S.C. § 5318(g)(3), the intent of Congress that financial institutions should be free to report suspicious transactions without fear of civil liability, and that Congress considered including a good faith requirement but specifically rejected it, defendant Firstar has unqualified immunity from civil liability for plaintiff Nieman's claims in this case. Therefore, defendant Firstar's Motion For Summary Judgment is granted and plaintiff Nieman's complaint is dismissed in its entirety.

**IT IS SO ORDERED.**

**DATED** this 26th day of September, 2005.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA